In the matter of the probate of the last will and testament
of DAVID SOLOMON, deceased.

Argued November term, 1923—Decided March 3, 1924.

On appeal from a decree of the prerogative court advised
by Vice-Ordinary Fielder, who filed the following opinion:

"The voluminous testimony contains a mass of contradic-
tions, not only as between the witnesses for the proponents
and the caveators, but also as between the witnesses for each
side.    It shows that most of them have strong bias and
prejudice, which, with their imagination, frequently in-
fluenced their statements.    It shows great bitterness and ill-
feeling between the proponent on the one side and her
brother Philip and her two sisters on the other, and charges
of attempt at murder, of adultery, of assault and battery, of
living in a house of prostitution and of theft were freely
made by the brother and sisters, one against the other.
From the volume of irrelevant, inconsequential and contra-
dictory testimony the following can be gathered:

"David Solomon, the testator, died November 13th, 1922,
at 11 A. M., at the age of seventy-six years.    He left him
surviving a widow, three daughters and two sons.    He had
had a paralytic stroke in 1918, and for some time before and
up to his death he was afflicted with diabetes, Bright's disease,
a weak heart, a rupture and other minor ailments.    The
primary cause of his death was uremic coma.    His first wife
died January 20th, 1918, and he married again December
23d, 1918, and separated from his second wife early in 1920.
His daughter. Mrs. Henrietta Milberg, and her daughter,
were the only members of his household at the time of his
death.    He had made a will, dated August 4th, 1921, divid-
ing his whole estate among his five children, share and share
alike, and appointing his son Taylor executor thereof.    On
Sunday, November 12th, 1922, his physical condition was

most serious, but he was able to converse and to move from his bed to a chair and back again, with assistance. His physician called on him about nine-thirty A. M., and was so alarmed over his condition that he advised him to send for his children, and when the testator said he did not want them, the physician took it upon himself to send for them, so that they might see their father before he died. He also called another physician in consultation between eleven and twelve o'clock, which other physician says that while the testator answered intelligently the few questions asked him, he was about dead when he, the physician, reached the house. About eleven A. M., on this day, the daughter, Mrs. Milberg, notified her attorney that her father wanted to make a will and requested him to come to their house for that purpose. Shortly thereafter the testator's son Philip called at the house and, without Mrs. Milberg's knowledge, obtained access to his father's bedroom. When Mrs. Milberg learned of Philip's presence she ordered him from the house, stating that his father did not wish to see him. He refused to leave and she summoned police assistance, and two policemen arrived, who were requested by Mrs. Milberg to remove her brother. In the presence of the officers, or by one of them, the testator was asked whether he desired his son Philip in the house, and the testator replied "No;" but Philip insisted upon remaining and created a disturbance; whereupon the policemen took him to the station-house, Mrs. Milberg accompanying them to lodge a complaint against her brother. At the police station Philip summoned an attorney, and the police authorities agreed to take Philip back to the house and ascertain his father's wishes, Philip agreeing to leave without further trouble, in case his father said he did not want him there. It is alleged by Mrs. Milberg and some of her witnesses that while Philip was in his father's bedroom, on the occasion of his first visit that day, he opened the illuminating gas jets in his father's room, without lighting them, and allowed the gas to flow, the inference from the testimony of the witnesses being that it was Philip's intention to asphyxiate his father, or to hasten his demise. I find no

ground for such inference. But when the testator's physician arrived for his third call that morning, during the absence of the party at the police station, he found the testator highly nervous and hysterical and in a fainting fit, or vertigo, and he discovered the room so full of gas that it affected him (the physician) and he at once had the testator carried to another room, where restoratives were applied. While the testator was being revived, Philip and his attorney, Mrs. Milberg and her attorney, the two police officers and several neighbors and friends, attracted by the commotion and excitement attendant upon Philip's arrest, returned from the police station. The physician refused the party admittance to the sick room until he had restored the testator to consciousness, and then Philip was allowed to enter. Philip says that he asked his father if he wanted him to remain, but that his father was unconscious and did not answer. Other witnesses say that his father said "No;" but whatever occurred in this respect, Philip and his attorney were soon ejected from the house. While this was going on Mrs. Stein, a daughter of the testator, probably in response to the doctor's message, called to see her father; but was refused admittance by Mrs. Milberg and her friends. Neither Philip Solomon nor Mrs. Stein was informed that Mrs. Milberg's attorney was in the house for the purpose of drawing their father's will. After Philip and his attorney had left the house, Mrs. Milberg and her attorney, the two policemen and the rest of the party, altogether twelve in number, entered the testator's small bedroom and the attorney introduced himself and asked the testator if he desired to make a will, and the testator replied "Yes." Mrs. Milberg and all the other persons who were present testified in this cause and their versions of the conversation which followed between the attorney and testator differ, it being obvious that some of them drew on their imaginations, rather than on their memories. Taking the testimony of the attorney as probably the most accurate account, the attorney then asked the testator of what his property consisted, and the testator replied that he had some money in bank and some real estate. The attorney next

*95 N. J. Eq.* In re Solomon.

asked the testator to whom he wanted to leave his property, and the testator answered to his daughter, Mrs. Milberg. The attorney saw that the testator was a very sick man and he knew he had other children; but he did not question the testator as to his reason for disinheriting his other children and his widow, nor did he discuss the subject of the will or any other subject, for the purpose of satisfying himself that the testator knew what he was doing, in the ten minutes which elapsed from the time he entered the bedroom until he retired to another room to draw the will. He returned in half an hour with a will by which the testator gave and devised his entire estate unto "my loyal, faithful and beloved daughter Henrietta * * * who has always so filialy, faithfully and loyally cared for and attended me for many years last past." The attorney read the will twice to the testator and asked him if that was what he wanted to do with his property, and the testator replied: "I want to leave everything to my daughter, Mrs. Milberg, who has been my housekeeper for a long time. Yes, everything to my daughter, Mrs. Milberg." The testator was then propped up in bed and, supported by Mrs. Milberg, signed the will in the presence of the spectators, four of whom attested the execution, and the attorney left, taking the will with him. It was then about two o'clock. Just after the will had been executed Taylor Solomon, a son of the testator, called to see his father and was admitted to his room. He says he took his father by the hand and said: "I am your son," and endeavored to talk with him; but his father's eyes were shut and he made no · response. At three o'clock, at the request of the testator's sons, another physician called on the testator and found him in a comatose condition, which in the doctor's opinion had continued for two hours, from which he could not arouse the testator by shaking him and shouting at him. At five o'clock a committee from the lodge, of which the testator was a member, called on him. The family physician was there again for his fourth call that day. The member of the committee who testified said that during their visit the testator appeared to doze and wake up, and that in

his waking periods they talked with him about ordinary matters, such as his health and whether he wanted a drink of water, and that his replies were rational; but that he regarded the testator as on his death bed and in no condition to transact business. At eleven o'clock the following morning, less than twenty-four hours after the will was executed, the testator died.

"The proponent points to the testimony of all those present at the preparation and execution of the will, as conclusive evidence that the testator was of sound and disposing mind, memory and understanding, and that in disposing of his estate he was not influenced by proponent.

"I am not satisfied, however, that the. testator's mind and memory were, at that particular time, sufficiently clear and sound to enable him to understand and appreciate the business in which he was then engaged, or to comprehend the property he was about to dispose of, the distribution he was about to make of it, the natural objects of his bounty and the relation of each of these factors to the other. The meagre information upon which the will was prepared was elicited at a time when the testator was on his death bed, suffering from a complication of diseases, and immediately after he had been "gassed" and had passed through trying hours of so much excitement and physical and mental strain that he had fainted, and his physician had refused to permit anyone to see him until he had been restored to consciousness, and then a dozen spectators, including two policemen and Mrs. Milberg, crowded into his small bedroom. If the testimony of Mrs. Milberg's daughter is to be believed, the testator had said he did not expect to make a will that day because it was Sunday, and yet a strange attorney is brought to his bedside, who, instead of excluding everyone from the room and quietly and alone ascertaining the testator's wishes and questioning him for the purpose of satisfying himself that the testator really and fully understood that he was depriving his other children of any share in his estate, in a short conversation, in the presence of a dozen curious persons, which consisted of a few questions on his part and brief answers on

the part of the testator, learned what he thought the testator wanted, and so soon as his understanding of that last wish could be transcribed to paper and read to the testator, had him affix his signature with Mrs. Milberg's assistance. I do not think it can be said that under these circumstances, and considering the testimony as to the testator's condition before, at the time and after the will was executed, the testator fully undersood what he was doing.

"The confidential relation which Mrs. Milberg bore to the testator and the physical condition of the testator on that day and the circumstances surrounding the preparation and execution of the will, raise the presumption that undue influence was exerted by Mrs. Milberg to induce the testator to give his whole estate to her to the exclusion of his other children, which presumption, unless rebutted by satisfactory evidence, controls as a conclusion of fact. *In re Cooper's Will, 75 N. J. Eq. 177; affirmed, 76 N. J. Eq. 614; In re Morrissey's Will, 91 N. J. Eq. 480.*

"At the time the will was being drawn and executed two of the testator's children were excluded from the house by Mrs. Milberg, and during that whole period she had the advantage and influence of the presence and services of herself and her attorney with the testator. Mrs. Milberg denies that in any way, directly or indirectly, did she induce the testator to make a will in her favor, and there is no affirmative testimony that she did, but she has failed to convince me that she maintained a disinterested attitude throughout the procedings of the day. Her testimony is evasive and contradictory, and her story as to how the will came to be prepared and executed, and how and why her attorney was called in to prepare it, instead of the attorneys who had theretofore attended to the testator's legal affairs, is an example of her unreliability as a witness. She testified that two days before the will was drawn her father requested her to send for his attorney, without stating his reason, and that she endeavored to find him, but could not; that her father had said nothing to her about making a will on the day in question, prior to the above-mentioned first visit of Philip Solomon to the house

and that while Philip was there, the testator told her to send for her lawyer to draw the will and she accordingly telephoned him but did not tell him why he was wanted and that she at no time talked with him about the terms of the will. When she was confronted with her daughter's testimony, which was to the effect that at seven o'clock that morning the testator had placed some deeds and title abstracts under Mrs. Milberg's pillow and had said to Mrs. Milberg: "My children do not care for me any more. Henrietta, I would like to leave everything to you, only it is Sunday, and I can't." She changed her testimony and said that following that conversation (in which no attorney was mentioned) she called her attorney on the telephone and asked him to come to the house, but did not tell him for what purpose. Her attorney testified that she called him on the telephone at eleven o'clock that morning and told him to come to draw her father's will. In the will appear adjectives and other words describing the affection of the testator for Mrs. Milberg and his appreciation of her services to him—words which the attorney does not say the testator used before the will was drawn and which he must have inserted in the will as a result of information from someone else, probably Mrs. Milberg. It appears from the testimony that Mrs. Milberg did not care for and attend the testator for many years, because his first wife lived with him and cared for him to January, 1918, and his second wife from December, 1918, to early in 1920, and that Mrs. Milberg was a nurse whose services were engaged by physicians and others, and that for several years prior and down to the spring of 1922 her time was largely occupied with this work and that she was living away from her father's home. According to her testimony, she gave so much time to this work that she earned much money and was able not only to support herself and her daughter, but to make money presents to her father from time to time and to purchase jewelry from him. There is nothing in the evidence to convince me that the testator was not on terms of friendship with his other children, especially Mrs. Stein and Taylor Solomon, and

such evidence as was offered to the contrary relates to conditions existing prior to August, 1921, when he executed a will under which all his children shared equally, and his son Taylor was made sole executor, and nothing appears in the evidence to show a change in such relationship which would explain why the testator should have disinherited them by the will in question.

"I conclude that Mrs. Milberg has not rebutted the presumption of undue influence which the facts raise by convincing testimony.

"For the reasons stated, probate of the will of November 12th, 1922, should have been denied."

*Mr. Edward Hollender,* proctor for the caveators.

*Mr. John J. Fallon,* proctor for the proponent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Ordinary Fielder.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, HEPPENHEIMER, GARDNER, VAN BUSKIRK, CLARK—11.

*For reversal*—None.